UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANIEL RILES, | : |
| Plaintiff, | : |
| | : PRISONER |
| V. | : CASE NO. 3:10-CV-652(RNC) |
| DANIEL BANNISH, ET AL., | : |
| Defendants. | : |

## INITIAL REVIEW ORDER

Plaintiff, an inmate at Northern Correctional Institution, brings this action pro se pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1986 against sixteen employees of the Department of Correction ("DOC"), as well as a Connecticut state trooper, all of whom are sued in their individual capacities only. The complaint claims damages for assault, conspiracy, deliberate indifference to serious medical needs and intentional infliction of emotional distress. Under 28 U.S.C. § 1915A, the Court must review the complaint and dismiss any part of it that fails to state a claim on which relief can be granted.[1]

I. The Complaint

The complaint alleges the following. On March 17, 2008, the plaintiff was assaulted at Northern by Correction Officer ("CO") Michael Blue. A surveillance camera recorded the assault on

---

[1] The caption of the complaint includes as defendants Dr. Rutherford and Dr. Miranda, but neither of them is mentioned in the body of the complaint. Accordingly, the complaint against them will be dismissed without prejudice for failure to state a claim on which relief can be granted.

videotape. As a result of the assault, the plaintiff sustained fractures of his left and right nasal bones. CO Carl Badeau, who witnessed the assault, ran up to Blue and remarked that he was going to have to "say something good." They agreed to falsely claim that the plaintiff had tried to spit on Blue.

Plaintiff was taken to the medical unit at Northern, where defendant Paul Wilbur, a nurse in the medical unit, gave him an ice pack for his nose. No x-ray was taken.[2] While in the medical unit, plaintiff complained to defendants Robert Ames and Ned McCormick, both supervisors on duty at the time, that Blue had assaulted him. They assured the plaintiff that his complaint would be investigated and Ames took photographs of the plaintiff's face and head. As a result of DOC's investigation, plaintiff's complaint was substantiated and disciplinary action was taken against Blue. No disciplinary proceeding was initiated against the plaintiff, however.

Plaintiff wrote to the Connecticut State Police reporting the assault. Defendant Bissaillon, a state trooper, took a statement from the plaintiff. Bissaillon told the plaintiff that he had viewed the videotape of the incident and spoken with Blue and Badeau. According to the plaintiff, Bissaillon stated that

---

[2] A medical incident report prepared by Nurse Wilbur contains the following "assessment" of the plaintiff's condition: "Alert and oriented X3, gait steady, small amount of blood left nostril, no active bleeding noted, neuro signs intact, nose midline with slight edema right side. No other injury noted."

2

he had agreed not to arrest Blue and that the plaintiff would be arrested if he "pushed the issue."

On March 18, 2008, the day after the assault, the plaintiff submitted a sick call request to the medical staff at Northern stating that he was in pain. He requested pain management and an x-ray of his nose. Six days later, on March 24, 2008, he was seen by Dr. Carson Wright, a physician at Northern. Plaintiff told Dr. Wright that he was in excruciating pain and believed his nose was broken. Dr. Wright ordered an x-ray of the plaintiff's nose, but failed to provide the plaintiff with pain medication, allegedly telling him to "man-up" and "take the pain."

On April 7, 2008, an x-ray was taken of the plaintiff's nose. A report of the results was returned to the medical unit two days later. The report contains the following findings: "multiple nose fractures of the right and left nasal bone, mildly displaced." The medical unit did not inform the plaintiff of the results of the x-ray or provide him with any additional treatment.

In early May 2008, the plaintiff submitted another sick call request. He stated that he was still in pain, his sense of smell was gone, and his ability to taste was diminishing. On June 23, he was seen by Dr. Wright. On that date, Dr. Wright informed him of the x-ray results. According to the plaintiff, he caught Dr. Wright attempting to make a false entry in the chart. When

3

questioned about this, Dr. Wright allegedly told the plaintiff, "I fucked up."

On June 29, 2008, plaintiff submitted an "inmate administrative remedy form" complaining about Dr. Wright's failure to provide adequate care for his broken nose and requesting to be seen by an outside doctor.

On July 21, Dr. Wright submitted a request to the Utilization Review Committee ("URC"), headed by defendant Mark Buchanan, asking that the plaintiff be checked by an ear, nose and throat specialist ("ENT"). In his request, Dr. Wright stated that the plaintiff was complaining about losing his ability to smell and taste food, that Dr. Wright had spoken with an ENT about this, and that the ENT had recommended that the plaintiff be seen by a specialist. Dr. Wright received no response from the URC. According to the complaint, Dr. Wright followed up with additional requests for the plaintiff to be seen by an ENT but these requests also were ignored.

In September 2008, plaintiff began to have recurring nosebleeds from his right nostril, which worsened over time. He informed medical staff at Northern. Defendant Wendy Sanders, a staff nurse, told him the nosebleeds were a normal reaction to temperature change within the unit and should be addressed by drinking fluids. To stop the nosebleeds, medical staff packed the plaintiff's nose with gauze and instructed him to do the same. The individuals who did this are not identified in the

4

complaint. After using the nose packs, the plaintiff developed a severe nasal infection.

On December 12, 2008, Dr. Wright submitted another request to the URC asking that the plaintiff be seen by an ENT. On December 22, the URC denied the request. Plaintiff signed the denial from the URC on December 29, 2008. That same day, he filed a grievance complaining that the URC had failed to act on the requests submitted by Dr. Wright. On January 20, 2009, defendant Sanders denied the grievance, informing the plaintiff that he should speak with Dr. Wright regarding his concerns and sign up for sick call as needed.

On August 14, 2009, Dr. Wright submitted another request to seeking approval for an ENT consult. This request was denied on September 15, 2009.

In October 2009, the plaintiff was examined by Dr. Syed Naqvi. Dr. Naqvi indicated that the nose packs used to stop the plaintiff's nosebleeds had been counterproductive in that they had caused the plaintiff's nasal infection and increased the bleeding. The doctor also indicated that a "smell test" administered to the plaintiff by Northern medical staff would not have aided in the diagnosis and treatment of his condition.

Plaintiff claims that as a result of the defendants' unconstitutional acts and omissions, he continues to suffer recurring nosebleeds, can no longer smell or taste food and has "developed an ailment that will require his nose to be re-broken

5

in order to be straightened."[3]

II. Analysis

A. § 1983 Excessive Force Claim

Accepting the allegations of the complaint as true, they are sufficient to state a claim for compensatory and punitive damages against Blue under § 1983 for use of excessive force in violation of the Eighth Amendment.

B. Conspiracy Claims Under §§ 1983 and 1985(3)

To adequately plead a conspiracy claim under § 1983, the plaintiff must allege facts showing that the defendants reached an agreement to violate one or more of his substantive constitutional rights and that he was actually injured as a result. To adequately plead a conspiracy claim under § 1985(3), he must further allege that the defendants' misconduct was racially motivated. Plaintiff's allegations do not satisfy these requirements.

The complaint alleges that Blue and Badeau conspired to falsely accuse the plaintiff of trying to spit on Blue. Filing a false charge of misconduct against a prisoner does not in itself violate a constitutional right. Freeman v. Rideout, 808 F.2d 949, 951-52 (2d Cir. 1986)("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of

---

[3] The nature of the "ailment" allegedly requiring that the plaintiff's nose be re-broken is not alleged.

6

a protected liberty interest."). Moreover, the complaint expressly alleges that the plaintiff was never disciplined as a result of the defendants' false statements. This claim is therefore dismissed without prejudice for failure to state a claim on which relief can be granted.

The complaint alleges that Ames and McCormick conspired to deprive the plaintiff of photos of pooled blood at the scene of the assault, which would help support a claim against Blue. The substantive constitutional right at issue here appears to be the right of access to courts. See Bounds v. Smith, 430 U.S. 817, 821-23 (1977); Morello v. James, 810 F.2d 344, 347 (2d Cir. 1987). To allege a violation of this right, the plaintiff must allege that the defendants intentionally took action to obstruct or impede his ability to pursue a claim against Blue resulting in actual prejudice to his legal position. See Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997); Duff v. Coughlin, 794 F. Supp. 521 (S.D.N.Y. 1992). Plaintiff's allegation that Ames and McCormick conspired against him is implausible, particularly in light of the allegations of the complaint showing that the assault was recorded on videotape and Ames took photos of the plaintiff's face and head. Moreover, there is no allegation that the absence of photos of the scene has caused the plaintiff any actual prejudice. For these reasons, the claim against Ames and McCormick is dismissed without prejudice for failure to state a claim on which relief can be granted.

The complaint alleges that Bissaillon conspired with Blue and others to deprive him of "the pursuit of justice through the criminal division." This claim appears to be based solely on Bissaillon's failure to take steps to have Blue prosecuted for assault.[4] Generally, a person is not entitled to sue a state official based solely on the nonprosecution of a criminal suspect. See Thompson v. Grey, 2009 WL 2707397, (E.D.N.Y. Aug. 26, 2009), aff'd, 2010 WL 2836637 (2d Cir. July 20, 2010). Accordingly, this claim is dismissed without prejudice for failure to state a claim on which relief can be granted.

C. Deliberate Indifference Claims

Plaintiff alleges that numerous individuals were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. A person is deliberately indifferent if he is aware of a serious medical need, and fails to provide treatment, consciously disregarding a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 834, 837 (1994). This state of mind is the "equivalent of criminal recklessness." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1994). Generally, "mere allegations of negligent malpractice do not state a claim of deliberate indifference." Id.

---

[4] Plaintiff does not allege that he is in danger of sustaining personal injury in the future as a result of Bissaillon's alleged agreement not to arrest Blue. See Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375, 378 (2d Cir. 1973); see also Okin v. Village of Cornwall-)n-Hudson Police Dept., 577 F.3d 414 (2d Cir. 2009).

8

Viewed in a light most favorable to the plaintiff, the allegations against Dr. Wright are sufficient to state a claim of deliberate indifference. According to the complaint, Dr. Wright responded to plaintiff's complaints of excruciating pain and his specific request for "pain management" by telling him to "man-up" and "take the pain." These allegations are sufficient to withstand review under § 1915A because the plaintiff may be able to prove that the failure to provide him with pain medication amounted to deliberate indifference. See Dulany v. Carnahan, 132 F.3d 1234, 1244 (8th Cir. 1997)(callous comments can be evidence of deliberate indifference). In addition, the complaint alleges (expressly or by reasonable implication) that Dr. Wright failed to properly diagnose and treat the plaintiff's broken nose in a timely manner even though the injury and need for treatment were obvious. These allegations also are sufficient at this stage, especially in view of Dr. Wright's alleged comments to the plaintiff. Accordingly, the action will proceed against Dr. Wright.[5]

The allegations of the complaint also are sufficient to state a claim for deliberate indifference against defendant

---

[5] Whether the allegations of the complaint are sufficient to support a claim for deliberate indifference against Dr. Wright with regard to the plaintiff's other medical problems (i.e. his recurring nosebleeds and alleged loss of the ability to taste and smell) is an issue that need not be addressed at this time and is better left until the plaintiff has the assistance of appointed counsel, which he has requested. By separate order, his request for appointed counsel will be granted.

9

Buchanan, head of the URC.  According to the complaint, the URC ignored repeated requests by Dr. Wright that the plaintiff be seen by an ENT.  These requests were based on the recommendation of an ENT, with whom Dr. Wright had spoken regarding the plaintiff's symptoms.  The complaint, construed favorably to the pro se plaintiff, implicitly alleges that Buchanan was aware of Dr. Wright's repeated requests and failed to act due to deliberate indifference.

 The allegations of the complaint fall short of supporting a deliberate indifference claim against Nurses Wilbur and Sanders.  The complaint charges these defendants with "gross incompetence."  But there is no allegation of an act or failure to act on the part of either of them evincing conscious disregard of a substantial risk of serious harm to the plaintiff's health.  Both attempted to provide treatment for the plaintiff's symptoms and, although there were some delays in responding to his complaints, neither of them ignored his medical needs.  See Demata v. New York State Correctional Dep't of Health Services, 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999)("Although a delay in providing medical care may in some cases constitute deliberate indifference, this Court has reserved such classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating condition for three days; or delayed major surgery for over two years.")(internal citations and quotations omitted).

Importantly, in contrast to Dr. Wright, there are no allegations of callousness on the part of Wilbur or Sanders.[6] Accordingly, the deliberate indifference claim against them is dismissed without prejudice for failure to state a claim on which relief can be granted.

The allegations of the complaint also are insufficient to state a claim for deliberate indifference against defendants Bannish, Marcial, Hicock, Fury, Weiskopf and LaPalme. The complaint lumps these defendants together and asserts that they supported a policy designed to encourage incompetence on the part of medical staff. A prison official who is personally responsible for creating or maintaining a policy of deliberate indifference may be subject to liability, Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995), but the allegation of such a policy must be more than merely conclusory. Ashcroft v. Iqbal, 129 S.

---

[6] The allegation that nose packs should not have been used to stop the plaintiff's nosebleeds does not support a deliberate indifference claim against Nurse Wilbur or Nurse Sanders because there is no allegation that either of them used or instructed the plaintiff to use nose packs and, in any event, improper use of nose packs would not amount to deliberate indifference. The same is true of the allegations regarding the use of an incorrect "smell test" (i.e. there is no indication that either of these defendants was involved in the test and the use of an incorrect would not constitute deliberate indifference in any case). The allegation that Nurse Sanders denied the plaintiff's medical grievance concerning the URC's delay in responding to Dr. Wright's requests for a consult with an ENT also fails to support a claim against her. As she noted in the written denial, the plaintiff was being followed by Dr. Wright at that time.

Ct. 1937, 1951, 173 L. Ed. 2d 868 (2009).[7]

D. Intentional Infliction of Emotional Distress

The complaint includes a claim for intentional infliction of emotional distress under § 1983. There is no recognized cause of action under section 1983 for intentional infliction of emotional distress. Accordingly, this claim is dismissed without prejudice for failure to state a claim on which relief can be granted.

III. Orders

In accordance with the foregoing analysis, the Court enters the following orders:

(1) All claims against defendants Badeau, Ames, McCormick, Bissaillon, Wilbur, Sanders, Bannish, Marcial, Hicock, Fury, Weiskopf, LaPalme, Rutherford and Miranda are hereby dismissed without prejudice for failure to state a claim on which relief can be granted.

(2) The claims for damages against defendants Blue, Wright and Buchanan in their individual capacities will proceed. No other claim or defendant will be included in the case unless a motion to amend filed in compliance with Federal Rule of Civil Procedure 15 is granted by the Court.

(3) Within ten (10) business days of this order, the Clerk

---

[7] With the exception of Bannish and LaPalme, there are no allegations that these defendants were aware of the plaintiff's injury or involved in his treatment. To the extent Bannish and LaPalme were made aware of plaintiff's health concerns, documents attached to the complaint indicate that they did not ignore plaintiff's concerns but relayed them to Dr. Wright.

12

will verify the current work addresses for defendants Blue, Wright and Buchanan and mail a waiver of service of process request packet to each in his individual capacity at his current work address. If any of these defendants fails to return the waiver request, the Clerk will make arrangements for in-person service by the U.S. Marshal and that defendant will be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(4) The Pro Se Prisoner Litigation Office will send a courtesy copy of the complaint and this order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

(5) The Pro Se Prisoner Litigation Office will send written notice to the plaintiff of the status of this action along with a copy of this order.

(6) Defendants will file their response to the complaint, either an answer or motion to dismiss, within seventy (70) days from the date of this order. If the defendants choose to file an answer, they will admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

(7) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, will be completed within seven months (210 days) from the date of this order. Discovery requests need not be filed with the court.

(8) All motions for summary judgment will be filed within eight months (240 days) from the date of this order.

(9) Pursuant to Local Civil Rule 9(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion may be granted absent objection.

So ordered this 11th day of August 2010.

/s/RNC
Robert N. Chatigny
United States District Judge
